**SO ORDERED.**

**SIGNED this 03 day of February, 2009.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE
_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| WILD WEST WORLD, L.L.C, | ) | Case No. 07-11620 |
| | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| WILD WEST WORLD, L.L.C, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adversary No. 07-5406 |
| | ) | |
| VILLAGE CHARTERS, INC., | ) | |
| d/b/a VILLAGE TOURS AND TRAVEL | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

Debtor in possession Wild West World, L.L.C. ("WWW") seeks to avoid and recover for the benefit of its creditors a preferential payment it made to Village Charters, Inc. on account of a loan made by Village Charters. This case came to trial on November 19, 2008. Plaintiff WWW appeared by W. Thomas Gilman. Defendant Village Charters, Inc. ("Village") appeared by Robert W. Slinkard. Its principals, Norman Arensdorf and Jeff Arensdorf, also appeared. After reviewing the parties pleadings, memoranda, the testimony and the exhibits admitted at trial, the Court is ready to rule.

Jurisdiction

This Court has jurisdiction of this adversary proceeding to recover a preference, a core proceeding.[1]

Facts

Wild West World, L.L.C. (WWW) filed for chapter 11 relief on July 9, 2007, and its companion company, Restoration Farms, Inc. (RFI) filed for chapter 11 relief on August 9, 2007.[2] WWW constructed a Old West theme amusement park called Wild West World in Park City, Kansas in 2006 and early 2007. Thomas Etheredge owned and managed WWW. Etheredge operated several other businesses including the Prairie Rose Chuckwagon Supper ("Prairie Rose") near Benton, Kansas, a tourist attraction that featured country-western or cowboy-themed musical entertainment performed by the Prairie Rose Wranglers ("Wranglers"). Village became acquainted with Etheredge in a series of business deals in which it packaged trips to the Prairie Rose on its

---

[1] 28 U.S.C. § 157(b)(1) and (b)(2)(F) and § 1334(b).

[2] Case No. 07-11913. On September 18, 2007 this Court ordered that the two bankruptcy cases would be jointly administered and procedurally consolidated.

2

buses, arranged through its travel agency. The relationship became cemented when Village handled the travel arrangements for a charter trip to Carnegie Hall in New York City for students from an area high school and a performance by the Wranglers. Village also arranged the Wranglers' tour to China in 2006.

Village is located in Wichita, Kansas and is owned by Norman Arensdorf and his son Jeff. It runs bus tours, bus charters and a travel agency. The record shows that Village derives all of its income from these activities. It is not a commercial lending entity of any kind and does not extend credit that is not connected with accounts and charges for travel and tour-related services it renders its customers.

On January 3, 2007, after Etheredge had begun constructing Wild West World, he contacted the Arensdorfs and invited them to lunch. At a meeting in Park City, near the amusement park, Etheredge mentioned that his construction progress had been faster than anticipated and that he had outrun his construction loans, leaving him and WWW in a cash crunch that made it difficult to pay contractors and vendors. Etheredge told the Arensdorfs that he needed $100,000 to tide him over. He mentioned no terms of repayment, only that he needed the money. The Arensdorfs told him they would consider this proposition and call him later.

After reflecting on Etheredge's proposal, the Arensdorfs remembered that they had put $100,000 back for Village quarterly taxes that would come due in April. Remembering that Etheredge had told them of an SBA loan to WWW that would fund "any day," they decided Village would loan WWW this $100,000. When Jeff Arensdorf communicated this to Etheredge on January 3 or 4, 2007, Etheredge offered him a $50,000 premium on the loan, payable as interest after the park's opening, but not on any set date. The principal loan was to be repaid in full on or before

3

April 1.

On January 4, 2007, Etheredge came to Village's place of business and presented the Arensdorfs with a "Promissary Note [sic]" ("Note") which read in full:

> Promissary Note
>
> I, Thomas Etheredge personally guarantees [sic] to Village Tour and Travel [sic] the sum of $100,000.00 plus a fixed interest amount of $50,000.00.
>
> Repayment of the principal $100,000.00 will be on or before April 1st, 2007. Repayment of the fixed interest of $50,000.00 will be on or before May 31st, 2007.
>
> Signed January 4th, 2007
>
> /s/ Thomas Etheredge

Etheredge prepared this document. The Arensdorfs and Etheredge met for half an hour and, during that meeting, the Arensdorfs presented Etheredge a check for $100,000.00 payable to "Restoration Farms, Inc." RFI in turn transferred the funds to WWW which used them in its amusement park construction efforts. According to both Arensdorfs, there was no discussion of financial information on RFI or WWW, no review of WWW's financial statements, no collateral was offered, and no counsel were consulted. Village had never made a loan of that size and character before and has not done so since. The Arensdorfs admitted that the loan transaction with WWW was "abnormal" and "unusual" and unlike any commercial loan extended to Village.

When April 1, 2007 came and went without payment, Jeff Arensdorf e-mailed Etheredge to inquire about the repayment of the $100,000 principal. Etheredge visited Village's office on April 4, bearing a check for $50,000. He offered to repay the entire principal amount then, but added that he still needed help with cash flow to complete the park. The Arensdorfs were disappointed not to receive the entire $100,000, but Etheredge persuaded them that, while his plans for the park were

4

progressing smoothly, delaying repayment of the other $50,000 for two weeks would assist his cash flow. While Jeff was concerned, he felt that Etheredge's word had been good in the past and, based on their previous relationship, he was inclined to grant an extension. Etheredge had frequently been tardy in their travel and tour dealings, but had always come through. The Arensdorfs reluctantly agreed to grant Etheredge a two week extension (to April 18) for repayment of the principal balance of the loan. When the rest of the money was not forthcoming, Jeff again e-mailed Etheredge on April 18. On April 19, Etheredge tendered a second check for $50,000. Both checks were written on the WWW account. Village never received the $50,000 premium. Wild West World park opened in May, and shortly thereafter, WWW filed its chapter 11 case on July 9, 2007.

Jeff Arensdorf testified that his prior dealings with Etheredge sometimes involved extensions of credit, usually in the form of prepaid tour deposits made by Village to assure travelers hotel rooms and flight reservations. He stated that he wanted the park to succeed as its success might well benefit Village's tour business. Jeff booked the WWW loan on Village's books as a "prepaid tour deposit," having no provision in Village's accounting system for "loans receivable."

The only other evidence offered at trial was the expert report of Core Strategies, Inc., offered by Village to support its ordinary course of business defense to the preference under § 547(c)(2). This report consisted largely of a legal analysis of why each payment was neither a fraudulent conveyance or a preferential transfer. The author, Mark Borofsky, is certified by the National Association of Credit Managers as a Certified Expert Witness and a Certified Credit Executive and has previously testified in bankruptcy preference avoidance cases. He is not a lawyer. WWW objected to admission of this expert report and Borofsky's expert opinion regarding the transfers at issue here.

5

The Court was satisfied that Borofsky had the requisite knowledge, skill, training, and education to address commercial credit practices and management and their relationship to this transaction. Nonetheless, the Court sustained WWW's objection to the admission of the expert report and to Borofsky's expert testimony under Rule 702.[3] On voir dire, WWW showed that while Borofsky had considered whether the payments made by WWW and accepted by Village would have fallen within the ordinary course of business and pursuant to ordinary business terms, he did not establish that Village was in the banking or credit business.[4] Borofsky's opinion centered primarily on the reasonableness of the extension for the second $50,000 payment granted by Village and his opinion that it is not uncommon in the lending industry for banks to grant extensions for repayment of loans. He therefore concluded that WWW's *payment* was in the ordinary course. However, Borofsky did not make any effort to establish what the ordinary course of business was between these two parties. Indeed, Borofsky conceded that he did not review the debits and credits between Village and WWW. Nor did Borofsky consider whether this loan and its terms were ordinary in the travel and tour industry or the amusement park industry. As such, the Court concluded that the report lacked the necessary factual predicate to be reliable. Nor was the report helpful.[5] The Court did not require the report's extensive legal analysis of fraudulent transfers and

---

[3] Fed. R. Evid. 702 states: "If scientific, technical, or other specialized knowledge *will assist the trier of fact to understand the evidence or to determine a fact in issue,* a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) *the testimony is based upon sufficient facts or data,* (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." (Emphasis added.).

[4] An initial element of the ordinary course of business defense requires that the payment be of a debt incurred by the debtor "in the ordinary course of business or financial affairs of the debtor *and the transferee . . .*". § 547(c)(2).

[5] Fed. R. Evid. 702 requires that the expert opinion "will assist" the trier of fact.

preferences and the meaning or interpretation of §§ 547 and 548. Accordingly, the expert report and Borofsky's testimony were not based on sufficient facts or data.[6] Core Strategies cannot be said to have applied reliable principles and methods to the facts of this case. Therefore, exercising its duty to act as the gatekeeper for expert opinion, the Court refused to admit the Core Strategies expert report into evidence.[7]

Analysis

In WWW's adversary complaint, it sought to avoid and recover both $50,000 payments. The April 4 payment fell outside of the 90-day preference period, but within the one-year fraudulent transfer recovery period in § 548(a). At trial, WWW abandoned the fraudulent transfer claim as to the first payment, leaving only the recovery of the April 19 payment as a preference in issue.

The bankruptcy trustee or the debtor in possession, acting as a trustee, has the power to avoid and recover certain payments made in anticipation of bankruptcy for the benefit of the creditors. This power supplements the underlying policy of the Bankruptcy Code which is to afford a fair distribution of the debtor's assets to all of its creditors and not simply favor those creditors who are first to the trough. In order for a transfer to qualify as a preference, it must have been (1) made to or for the benefit of a creditor; (2) on account of an antecedent debt owed by the debtor; (3) while the debtor was insolvent; (4) within 90 days of the date of the bankruptcy petition; and (5) resulting in the creditor receiving more than it would have if the case were liquidated in chapter 7 and if the

---

[6] *See* Fed. R. Evid. 702(1); *Specht v. Jensen,* 853 F.2d 805 (10th Cir. 1988), *cert. denied* 488 U.S. 1008 (1989) (reversible error to permit expert to testify as to legal conclusions to be drawn from the evidence presented; trial judge is the sole arbiter of law).

[7] *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

7

transfer had not been made.[8] The parties stipulate that all of the elements of § 547(b) are met here and that the payment was preferential.[9]

In defense of the preference claim, Village asserts that the payment was made in the ordinary course of business or according to ordinary business terms as provided in § 547(c)(2). Section 547(c)(2) saves otherwise preferential transfers –

> 2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was--
> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
> (B) made according to ordinary business terms;

Courts recognize that the ordinary course defense has both a subjective and an objective test.[10] The Tenth Circuit Bankruptcy Appellate Panel has held that the subjective test examines whether the transfers at issue were "ordinary as between the parties" and the objective test examines whether the transfers were "ordinary in the industry."[11] A transaction must meet both tests in order to qualify as an exception. A defense under § 547(c)(2) should be narrowly construed.[12] First, however, the Court must determine whether the debt itself was incurred in the ordinary course of the business or

---

[8] *See* 11 U.S.C. § 547(b).

[9] The parties stipulated that the payment to WWW was on account of an antecedent debt, notwithstanding the less than straightforward documentation (a "note" from Etheredge and a loan proceeds disbursement to RFI). The parties apparently concede that they intended the debt to run from WWW to Village.

[10] *See* William L. Norton and William L. Norton, Jr.*, NORTON BANKRUPTCY LAW AND PRACTICE, 2ND ED.*, § 57:20 (2005).

[11] *Payne v. Clarendon Nat'l Ins. Co. ( In re Sunset Sales, Inc.)*, 220 B.R. 1005, 1020 (10th Cir. BAP 1998).

[12] *Id.*

8

financial affairs of the debtor, WWW, and the transferee, Village.

The details of this particular loan transaction make clear that this debt was atypical of those incurred by WWW in its dealings with Village and of commercial loans in general. Here, Etheredge offered WWW a $50,000 premium for a loan of $100,000 for a period of three months. This is an effective accrual rate of some $555 per diem or about 200 per cent per annum. No evidence was offered in support of this arrangement being typical of "normal business relations," nor is it likely that any could have been offered. The Note signed by Etheredge is unlike any instrument this Court has previously reviewed. Although the loan was supposedly to be made to WWW, Etheredge signed in his personal capacity and characterized his obligation as a "guaranty." No credit analysis of any kind was done by Village. Nothing in the record suggested that such an arrangement and a late payment would be typical of extensions of credit made in either the travel or the amusement park industry.

Even were this Court to find the underlying extension of credit to be within the ordinary course, Village still had the burden to show that the payment itself was a transfer ordinary between the parties or done on ordinary business terms. It showed neither. Courts consider four primary factors to determine if payments are ordinary between the parties as required under the subjective test: (1) the length of time the parties were engaged in the transaction in issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activity; and (4) the circumstances under which the payment was made.[13] These factors are typically considered by comparing pre-preference period transfers

---

[13] *Id.* at 1021-1022.

with preference period transfers.[14] In the absence of any prior transactions, courts typically look to see if the debtor complied with the payment terms of its contract.[15] Late payments are typically not "ordinary," unless the creditor establishes that a pattern of late payments was ordinary between the parties.[16] In interpreting the objective test, the Tenth Circuit has held that "ordinary business terms" are terms used in "'normal financing relations:' the kinds of terms that creditors and debtors use in ordinary circumstances, when debtors are healthy."[17]

Applying these rules to the facts in issue, the Court observes first that this was the only "loan" ever contracted between Village and WWW. Indeed, it appears to have been the only loan ever extended to anyone by Village. Viewed subjectively, there was no ordinary course as between these parties with respect to a transaction of this nature. Applying the *Sunset Sales* factors, the Court finds that (1) the parties were only engaged in this transaction for four months; (2) there are no past practices between them against which to measure this payment event; (3) there appear to have been "dunning" e-mails to which the debtor responded with payment; and (4) the payment was made late. To the extent the Note is a contract between WWW and Village, its terms were clearly breached. Thus, the Court cannot find this payment to have been made in the ordinary course of the parties' business.

Nor was this payment made according to ordinary business terms, defined by the Tenth Circuit as those used in "normal business relations." These are certainly not "terms that debtors and

---

[14] *Id.* at 1022 (citations omitted).

[15] *Id.*

[16] *Id.*

[17] *Clark v. Balcor Real Estate Fin., Inc. (In re Meridith Hoffman Partners)*, 12 F.3d 1549, 1553 (10th Cir. 1993).

10

creditors use in ordinary circumstances, *when debtors are healthy*." In this case, the payment, made some 19 days after its due date, and only after the debtor was dunned, cannot be said to be made on terms used when debtors are healthy. Even if the debt itself was incurred in the ordinary course, there is no evidence of ordinary business practices in either the travel or the amusement industry or that this late payment would be consistent with them.

Village has failed to prove that this transaction was in the ordinary course of business of itself and the debtor, and that the transfer was made either in the ordinary course or on ordinary business terms. Accordingly, WWW may recover the April 19 payment of $50,000 as a preferential transfer and judgment is be entered avoiding the preferential transfer and retaining it for the benefit of the estate pursuant to § 550. A Judgment on Decision will issue this day.

# # #